UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| HOWARD "PAUL" EGGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:19-CV-495-CEA-DCP |
| | ) | |
| ELI EVANS, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and the Order [Doc. 32] of referral by the District Judge.

Now before the Court is Plaintiff's Motion for Entry of Default [Doc. 31]. By way of background, on March 4, 2021, the Court entered a Show Cause Order [Doc. 34], directing Defendant to appear before the undersigned on April 6, 2021, to show cause why a default judgment should not be entered. During the April 6 hearing, Attorney James Friauf appeared on behalf of Plaintiff. Plaintiff appeared via video conference. Defendant appeared pro se. During the April 6 show cause hearing, Defendant explained why he had not responded to the lawsuit. The Court took Defendant's reasons under advisement and set a hearing on damages for April 29, 2021. At the evidentiary hearing on April 29, Attorney James Friauf appeared on behalf of Plaintiff. Plaintiff appeared via video conference, and Defendant appeared pro se. Both parties testified during the evidentiary hearing.

Accordingly, for the reasons stated below, the Court **RECOMMENDS** that Plaintiff's Motion [**Doc. 31**] be **GRANTED IN PART AND DENIED IN PART**. Specifically, the Court **RECOMMENDS** that default judgment be entered against Defendant in the total amount of

1

$350,000.00, which constitutes $175,000.00 in compensatory damages and $175,000.00 in punitive damages.

**I.     BACKGROUND**

The Court will first summarize the allegations in this case and then turn to the procedural history.

**A.     Allegations**

The Complaint [Doc. 1] in this matter was filed on December 3, 2019, and later amended on February 6, 2020. [Doc. 13].[1] The Second Amended Complaint ("Amended Complaint") alleges that Plaintiff obtained employment with Piedmont Airlines, Inc., d/b/a American Airlines ("Piedmont") on or about March 4, 2019, as a baggage handler. [*Id.* at ¶¶ 12-13]. Plaintiff alleges that on or about August 15, 2019, Plaintiff was subjected to quid pro quo sexual harassment and sexual assault by Defendant, who was his direct supervisor. [*Id.* at ¶ 16]. Plaintiff states that Defendant summoned Plaintiff to his office to discuss employment matters and asked Plaintiff if Plaintiff liked working for Piedmont and whether he wanted to advance within the company. [*Id.* at ¶ 18]. Plaintiff responded that he enjoyed working for Piedmont and wanted to advance his career at Piedmont. [*Id.* at ¶ 19]. The Amended Complaint alleges that Defendant instructed Plaintiff to expose his genitals to Defendant. [*Id.*]. Plaintiff complied with Defendant's instructions because Plaintiff was concerned about the prospects of his future employment. [*Id.* at ¶ 20]. The Amended Complaint states that Defendant fondled and photographed Plaintiff's

---

[1] The Court notes that the original lawsuit named Piedmont Airlines, Inc., d/b/a American Airlines, Eli Evans, and Marvin Mulder as defendants. [Doc. 1]. When Plaintiff filed his Second Amended Complaint, he did not name Marvin Mulder as a defendant. *See* [Doc. 13]. On October 15, 2020, Plaintiff and Piedmont Airlines, Inc., d/b/a American Airlines filed a Notice of Settlement [Doc. 27] and later a Notice of Voluntary Dismissal [Doc. 28]. Thus, the only remaining Defendant is Eli Evans, and the Court will not discuss in length the allegations against the defendants that are no longer in this case.

genitals. [*Id.* at ¶¶ 20-21]. The Amended Complaint alleges that after sexually assaulting Plaintiff, Defendant instructed Plaintiff to zip up his pants and leave the office. [*Id.* at ¶ 22].

The Amended Complaint alleges that Defendant continued to sexually harass Plaintiff after the assault, including sending harassing text messages. [*Id.* at ¶ 23]. Plaintiff alleges that he reported the sexual harassment to Piedmont, and thereafter, Piedmont engaged in a campaign of retaliation against him. [*Id.* at ¶ 26]. The Amended Complaint states that due to Defendant's sexual harassment and assault, Plaintiff has suffered tremendous emotional trauma and is currently treating at an-inpatient facility for post-traumatic stress disorder ("PTSD"). [*Id.* at ¶ 28].

Plaintiff alleges assault and battery and intentional infliction of emotional distress against Defendant. [*Id.* at 6-7]. In the prayer of relief, Plaintiff seeks $350,000.00 in compensatory damages and $2,000,000.00 in punitive damages. [*Id.* at 7].[2]

### B. Procedural History

As mentioned above, the original Complaint was filed on December 3, 2019, and personally served on Defendant on March 30, 2020. [Doc. 18]. Defendant did not respond to the Complaint within twenty-one (21) days of filing, and therefore, the Clerk entered an entry of default [Doc. 22] on May 20, 2020. On January 5, 2021, the District Judge entered an Order [Doc. 30], directing Plaintiff to show cause as to why he had not moved for entry of default judgment against Defendant. On January 19, 2021, Plaintiff filed the instant Motion. [Doc. 31].

On March 3, 2021, the Court entered an Order to Show Cause [Doc. 34], directing Defendant to appear on April 6, 2021, to show cause why a default judgment should not be entered against him. In the Order to Show Cause, the Court also instructed Plaintiff to be prepared to

---

[2] The Court notes that Plaintiff's requested sums are against "Defendants." [Doc. 13 at 7].

3

address the specific causes of action against Defendant. [*Id.*]. For instance, the Court explained that in the Amended Complaint, Plaintiff alleges assault and battery and intentional infliction of emotional distress, but Plaintiff's Motion states that his causes of action against Defendant are pursuant to Title VII and the Tennessee Human Rights Act ("THRA"). In addition, the Court noted that Plaintiff's Motion requests attorney's fees, but Plaintiff had not provided the legal authority for such a request. [*Id.*]. As mentioned above, at the April 6 hearing, Attorney James Friauf appeared on behalf of Plaintiff, and Defendant Evans appeared on behalf of himself. Plaintiff also appeared via video conference.

During the April 6 show cause hearing, Defendant acknowledged that he was served with the lawsuit. Defendant claimed that he was served in April 2020. Defendant explained that he did not respond to the lawsuit because it was served during a hard time in his life, and later, the lawsuit simply "fell through the cracks." Defendant stated that he attempted to retain counsel, but the COVID-19 pandemic made life hard and then his uncle became ill. Defendant further stated that he called the Court asking for help, but someone told him that he/she could not offer legal advice and that his time had expired for responding to the lawsuit. He also stated that during this time, he tried to find another job because he had been furloughed and that he was worried about keeping his apartment and vehicle.

Defendant further explained that the last time he attempted to find counsel was when he was served with the entry of default. Defendant assumed that the entry of default meant that he lost his chance to respond. Defendant also stated that a Piedmont employee told him not to worry about the lawsuit. Defendant stated that he later contacted Piedmont again regarding the lawsuit but that an employee, "Carlene," told Defendant that she could not speak about the lawsuit anymore.

4

After considering Defendant's reasons for not responding to the lawsuit, the undersigned set the damages hearing for April 29, 2021. On April 29, 2021, Attorney James Friauf appeared on behalf of Plaintiff. Plaintiff was also present via video conference. Defendant appeared pro se. Both parties testified during the April 29 evidentiary hearing, and Plaintiff submitted medical records in support of his request for damages. [Exs. 1 and 2]. At the conclusion of the evidentiary hearing, the Court allowed supplemental briefing, specifically to address Plaintiff's request for $2 million in punitive damages. Plaintiff filed a Post-Hearing Brief As to Punitive Damages ("Post-Hearing Brief") [Doc. 40] on May 14, 2021, and Defendant did not respond.

## II. POSITIONS OF THE PARTIES

Plaintiff's Motion [Doc. 31] requests that default judgment be rendered against Defendant pursuant to Rule 55(b). In support of Plaintiff's request, Plaintiff filed the Affidavit of James Friauf ("Affidavit") [Doc. 33]. The Affidavit states that Defendant was served with the summons and the Amended Complaint on March 20, 2020, and that the Clerk entered a default against Defendant on May 20, 2020. The Affidavit states that Plaintiff's claim results from Defendant's violations of Title VII, the THRA, and Tennessee common law. Plaintiff requests default judgment in the amount of no less than $2,000,000.00 and payment of his reasonable attorney's fees.[3]

Plaintiff's Post-Hearing Brief [Doc. 40] summarizes the testimony that Plaintiff provided at the April 29 evidentiary hearing and argues that punitive damages are warranted in the instant matter. Plaintiff requests that the Court determine the appropriate amount of punitive damages

---

[3] As mentioned above, the undersigned's March 4 Show Cause Order directed Plaintiff to be prepared to address what specific causes of action he has alleged against the remaining Defendant and the legal authority for his request for attorney's fees.

after a hearing is conducted to address the nine factors set forth in *Emerson v. Oak Ridge Research, Inc.*, 187 S.W.3d 364 (Tenn. Ct. App. 2005).

### III. TESTIMONY

During the April 26 hearing, Plaintiff and Defendant testified. The Court will summarize their testimonies in the order in which they were presented at the hearing.

#### A. Plaintiff's Testimony

Plaintiff testified that he previously worked for Piedmont Airlines as a baggage handler. Defendant was the weekend assistant manager, and Plaintiff was Defendant's direct subordinate. Plaintiff stated that on the date of the incident, Defendant texted Plaintiff and asked if Plaintiff could come into work early. Plaintiff complied and went to Defendant's office. When Plaintiff arrived, Defendant began asking about an incident that had occurred the previous day. Plaintiff testified that the incident involved him arriving late to where he was supposed to be. Defendant asked Plaintiff where he would like to be with the company and whether Plaintiff enjoyed his job. Plaintiff responded that he enjoyed his job. Defendant told Plaintiff not to worry about the incident from the previous day.

Plaintiff testified that Defendant then stated, "Manager hat off, and friend hat on," and the conversation became inappropriate. For instance, Plaintiff testified that Defendant started talking about Plaintiff's personal life. Defendant talked about the size of Plaintiff's manhood and stated that he assumed it was rather large. Plaintiff testified that Defendant asked to see Plaintiff's genitals. Plaintiff stated that he did not want to lose his job, so he complied. Defendant then got closer to Plaintiff, and Defendant's hand made contact with Plaintiff's genitals. Plaintiff stated that Defendant "reached, grabbed, and held on to [Plaintiff's] genitalia." Defendant asked if Plaintiff liked it, and Plaintiff nervously laughed it off. Plaintiff stated that Defendant also took

6

photographs of his genitals using a cell phone and that he does not know what happened to the photographs. Plaintiff stated that not knowing what happened to the photographs still haunts him. Plaintiff stated that he was in Defendant's office for approximately two hours and that when he went back to work, other workers commented that Plaintiff was in the office for a long time.

After the incident, Plaintiff stated that he did not know what to do with himself. He stated that Defendant continued to send him inappropriate texts, asking for photographs. Plaintiff stated that for instance, Defendant asked him via text message for more photographs of Plaintiff's "donkey d***." In addition, Defendant texted Plaintiff that Defendant wanted to see photographs of Plaintiff's erect penis. Plaintiff declined to send Defendant sexually explicit photographs. Plaintiff testified that he remained employed with Piedmont during this time but not for too much longer.

Plaintiff testified that afterwards, his life started spiraling. Plaintiff could not sleep, he had nightmares, he began having suicide ideations, and began using alcohol. Plaintiff stated that he drank alcohol to sedate himself because he thought that there was something wrong with him and that he brought the incident on himself. Plaintiff stated that he checked himself into the crisis stabilization unit at the Helen Ross McNabb Center and that he committed to three (3) days of therapy. Afterwards, Plaintiff felt like he needed more in-depth therapy, so he went to a place in Utah that specializes in PTSD. In support of his emotional trauma, Plaintiff submitted his medical records from the Helen Ross McNabb Center [Ex. 1] and medical records from a community health care center [Ex. 2].

Plaintiff's medical records from Helen Ross McNabb Center state that Plaintiff was admitted on January 6, 2020, to the crisis stabilization unit for increased anxiety, paranoia, and suicidal ideation without intent or a plan. [Ex. 1 at 12]. Plaintiff discussed Defendant's sexual

harassment and stated that he had taken legal action. [*Id.*]. Plaintiff further reported that he felt like his coworkers were talking about him and that they had access to the photographs that Defendant took. [*Id.*]. Plaintiff was discharged on January 9, 2020, with plans to attend the Deer Hollow Recovery & Wellness Center in Utah. [*Id.* at 14].

The records from the community health center state that Plaintiff experienced a traumatic experience at work when his boss sexually harassed him. [Ex. 2 at 2]. Plaintiff also reported having been in therapy for ten (10) years when he was younger. [*Id.*]. Throughout his treatment at the community health center, Plaintiff attributed the following to Defendant's conduct: experiencing nightmares [*id.* at 3-6, 7-8, 16, 25]; having issues with cameras [*id.* at 4-6]; experiencing feelings of anger, disgust, depression, and shame [*id.* at 5, 7-8,10-11, 14-15, 17]; and suicidal ideation [*id.* at 6]. Plaintiff also reported a history of trauma and family issues prior to the incident. [*Id.* at 7-8, 15-16].

Plaintiff testified that before the incident, his life was fairly normal. Plaintiff stated that he did not have many emotional issues and that life was looking good. Plaintiff testified that he wanted to get involved in aviation, but after the incident, his whole life came crashing down. Plaintiff stated that he still has trust issues and problems with cameras. In addition, Plaintiff has issues being romantic. Plaintiff testified that he moved his life from Tennessee to Utah because of the incident.

Defendant did not cross exam Plaintiff.

**B.     Defendant's Testimony**

Defendant testified that Plaintiff's post-traumatic stress was the result of Plaintiff's military service and that Plaintiff's PTSD is not new and was not caused by the incident.

Plaintiff did not cross exam Defendant.

8

## IV. ANALYSIS

The Court has considered Plaintiff's Motion and the evidence presented at the hearing. Accordingly, for the reasons stated below, the Court **RECOMMENDS** that Plaintiff's Motion [**Doc. 31**] be **GRANTED IN PART AND DENIED IN PART.**

The Court will first discuss the standard with respect to default judgments pursuant to Rule 55 and then turn to Plaintiff's requested amount of damages.

### A. Rule 55

"When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Following the entry of default, a party may apply for default judgment, and the Court may conduct a hearing – if needed, to perform an accounting, determine the amount of damages, establish the truth of any allegation by evidence, or investigate any other matter – prior to entering default judgment. Fed. R. Civ. P. 55(b). "Once the Clerk has entered a default against a defendant, the Court must treat all well-pleaded allegations in the Complaint as true." *AF Holdings LLC v. Bossard*, 976 F. Supp. 2d 927, 929 (W.D. Mich. 2013) (citing *Thomas v. Miller*, 489 F.3d 293, 299 (6th Cir. 2007) (entry of default judgment "conclusively establishes every factual predicate of a claim for relief")).

In the present matter, the Clerk entered a default against Defendant on May 20, 2020. [Doc. 22]. On March 4, 2021, the Court entered a Show Cause Order [Doc. 24], directing Defendant to appear in Court on April 6, 2021, to show cause as to why a default judgment should be not be entered. Defendant appeared at the April 6 hearing and explained his reasons for not responding to the lawsuit.

9

The Court has considered Defendant's reasons for not responding to the lawsuit, but the Court recommends that default judgment be entered against Defendant. Although Defendant did not explicitly request that the entry of default be set aside, the Court will construe Defendant's statements at the April 6 hearing as such a request given his pro se status.

Specifically, under Rule 55(c), the court may set aside an entry of default for "good cause shown." Fed. R. Civ. P. 55(c). Courts should consider the following factors in determining whether the entry of default should be set aside: (1) whether plaintiff will be prejudiced; (2) whether defendant has a meritorious defense; and (3) whether defendant's culpable conduct led to the default. *United States v. Goist,* 378 F. App'x 517, 519 (6th Cir.2010) (other citations omitted). The above factors are more leniently applied when the party is requesting setting aside an entry of default as opposed to a default judgment. *Id.* (citing *Shepard Claims Serv., Inc.,* 796 F.2d at 193–94).

The Court has considered the above factors and finds that they weigh in favor of proceeding with the default judgment. Here, Defendant was served with the Amended Complaint on March 20, 2020, and Defendant did not make an appearance in this case until April 6, 2021. Given the significant passage of time, the Court finds that Plaintiff would be prejudiced by setting aside the default. With respect to the second factor, although Defendant generally denied liability at the April 6 hearing, he did not sufficiently explain whether he had a meritorious defense to the allegations. Finally, with respect to the final factor, Defendant acknowledged that he was served with the lawsuit about a year before he made an appearance. He simply did not respond to the lawsuit. Although the Court sympathizes with Defendant in that 2020 was a difficult year for many individuals, it does not excuse Defendant's ignorance of the lawsuit. Accordingly, the Court **RECOMMENDS** that the entry of default not be set aside.

Given that the Court recommends that the entry of default not be set aside, the Court **INCORPORATES BY REFERENCE** the allegations set forth by Plaintiff against Defendant in the Amended Complaint [Doc. 13]. The Court accepts all such allegations, and specifically, the Court **FINDS**, based upon entry of default, that Defendant committed assault and battery and intentional infliction of emotional distress against Plaintiff.

The Court will now turn to the amount of damages that Plaintiff has requested.

**B.     Damages**

As noted above, the instant Motion states that Defendant violated Title VII and the THRA, and Plaintiff seeks $2 million in damages and attorney's fees. At the hearing, however, Plaintiff explained his causes of action against Defendant are assault and battery and intentional infliction of emotional distress as alleged in the Amended Complaint. In addition, Plaintiff clarified at the hearing that he seeks $250,000.00 in compensatory damages and $2 million in punitive damages against Defendant. Plaintiff acknowledged that there is no legal basis for an award of attorney's fees.

Defendant argued at the hearing that he never threatened Plaintiff with his job and that he (Defendant) did not have any malicious intent. Defendant believed that the parties were engaged in a mutual conversation, and he denied that he is a predator. Defendant also denied he committed assault. Defendant argued that Plaintiff's PTSD was the result of his military service.

Accordingly, the Court has considered the evidence in this case and recommends that Plaintiff be awarded $175,000.00 in compensatory damages and $175,000.00 in punitive damages. The Court will first address Plaintiff's request for compensatory damages and then turn to his request for punitive damages.

### A. Compensatory Damages

With respect to compensatory damages, the evidence shows that Defendant instructed Plaintiff to report to his office where Defendant discussed Plaintiff's continued employment and opportunity for advancement within the company. Defendant then began talking about Plaintiff's personal life, and he directed Plaintiff to show Defendant his genitals. Defendant touched and took photographs of Plaintiff's genitals. Plaintiff testified that he does not know what happened to the photographs and that "still haunts" him today. After the incident, Defendant sent Plaintiff inappropriate text messages regarding Plaintiff's genitals and requested sexually explicit photographs, to which Plaintiff declined. The Court finds Defendant's conduct particularly egregious.

In recommending an award of $175,000.00 in compensatory damages, the Court has considered Plaintiff's testimony, the medical evidence, and Defendant's testimony. The Court is also guided by the factors articulated in *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 209–10 (Tenn. 2012). Specifically, in *Rogers*, the Tennessee Supreme Court explained that while expert testimony is not required to establish the existence of a serious mental injury, the following nonexclusive factors inform the analysis and are pertinent to support a plaintiff's serious mental injury claim:

> (1) Evidence of physiological manifestations of emotional distress, including but not limited to nausea, vomiting, headaches, severe weight loss or gain, and the like; (2) Evidence of psychological manifestations of emotional distress, including but not limited to sleeplessness, depression, anxiety, crying spells or emotional outbursts, nightmares, drug and/or alcohol abuse, and unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, and worry; (3) Evidence that the plaintiff sought medical treatment, was diagnosed with a medical or psychiatric disorder such as post-traumatic stress disorder, clinical depression, traumatically induced neurosis or psychosis, or phobia, and/or was prescribed medication; (4)

> Evidence regarding the duration and intensity of the claimant's physiological symptoms, psychological symptoms, and medical treatment; (5) Other evidence that the defendant's conduct caused the plaintiff to suffer significant impairment in his or her daily functioning; and (6) In certain instances, the extreme and outrageous character of the defendant's conduct is itself important evidence of serious mental injury.

In January 2020, Plaintiff checked himself into the crisis stabilization unit at the Helen Ross McNabb Center, where he was diagnosed with PTSD due to Defendant's actions. In addition, Plaintiff moved to Utah and began seeking treatment at a mental health community center. Plaintiff testified about the emotional harm he sustained because of Defendant's actions, including turning to alcohol to make himself feel numb; having nightmares; and experiencing suicidal ideation, anxiety, depression, shame, and guilt for what had occurred. Plaintiff also discussed how he still has issues being around cameras and becoming romantically involved with others. The Court finds Defendant's conduct to be so extreme and outrageous that Plaintiff's resulting serious mental injury should not be a surprise.

The Court has also considered Defendant's testimony that Plaintiff had mental health issues prior to the incident, relating to Plaintiff's military service. The Court acknowledges that Plaintiff has a mental health history that existed prior to the incident as such is documented in the medical records, which the Court has also taken into consideration. *See* [Ex. 2 at 7-8, 15-16]. The Court finds, however, that Plaintiff is a credible witness and that his trauma as a result of the incident is genuine. For instance, the Court was able to view Plaintiff's demeanor when discussing what took place and how it affected him. Specifically, in describing this experience, Plaintiff's facial expressions, tone of voice, and manner were convincing when he recounted the incident and the emotional distress it caused. *See Rogers v. Cofield*, No. 08-CV-10684-MBB, 2011 WL 6140974, at *30 (D. Mass. Dec. 8, 2011) (stating that the jury could have found plaintiff suffered a

considerable amount of emotional pain and suffering, explaining that plaintiff's facial expressions, tone of voice, and manner were convincing). The incident clearly affected Plaintiff's mental wellbeing as he had difficulty discussing the incident and was visibly upset when testifying. Accordingly, the Court **RECOMMENDS** that Plaintiff be awarded $175,000.00 in compensatory damages.

While the Court has considered Plaintiff's request for $250,000.00 in compensatory damages, the Court finds $175,000.00 to be a more appropriate award with what occurred and how it affected Plaintiff. While the incident was reprehensible, the Court notes that the sexual assault and later harassment via text messaging were short in duration. In addition, while keeping in mind the specific emotional trauma Plaintiff sustained from the incident, the Court has considered other awards in similar cases as useful guideposts given that placing a dollar amount on an individual's emotional stress is often a difficult task.

For instance, recently, a plaintiff was awarded $250,000.00 when her probation officer instructed her to send him sexually explicit photographs and later ordered her to perform oral sex on him during an in-home visit. *See McPeters v. Thomas*, No. 3:18-CV-39-CLC-HBG, 2021 WL 1033240, at *5 (E.D. Tenn. Feb. 24, 2021), *report and recommendation adopted,* No. 3:18-CV-39, 2021 WL 1030981 (E.D. Tenn. Mar. 17, 2021), *appeal docketed*, No. 21-5401 (6th Cir. 2021). In *McPeters*, the plaintiff offered similar testimony about the emotional distress the incident caused her to experience and the negative effects that the incident had on her life. *Id.* at *2-3.

The undersigned also finds the court's decision in *Styka v. My Merchants Servs. LLC* helpful. In *Styka*, the court granted a motion for default judgment and awarded plaintiff $120,000.00 in emotional distress damages. No. 14CIV6198ENVVMS, 2016 WL 11396819, at *5 (E.D.N.Y. Mar. 15, 2016*), report and recommendation adopted*, No. 14CIV6198ENVVMS,

2016 WL 3866550 (E.D.N.Y. July 13, 2016).  The plaintiff testified that her supervisor engaged in sexual and race-based harassment over a five-month period and that she was subjected to numerous sexual advances, including grabbing parts of her body, attempts to kiss plaintiff, and comments that made plaintiff feel like a "piece of meat."  *Id.* at * 5.  The supervisor also knew the plaintiff was going through a divorce and could not afford to leave her job.  *Id.* at *3.  The plaintiff testified that her supervisor told her that he knew she needed him and could not leave.  *Id.*

In recommending an award of $120,000.00 in compensatory damages, the court discussed other cases within the Second Circuit.  *Id.* at *5.  The court explained that the plaintiff's allegations of emotional distress were significant, especially in light of her continued symptoms almost two years after the incident, including her occasional use of anti-anxiety medication.  *Id.*  The court noted, however, that the allegations were only supported through the plaintiff's testimony, the plaintiff's employment was brief, and plaintiff experienced other life events that caused her distress.  *Id.*  Thus, the court recommended an award of $120,000.00 in compensatory damages "based on [p]laintiff's submissions and testimony, the severity and intensity of [the supervisor's] harassing behavior, the brief duration of her employment, the continuation of [p]laintiff's symptoms, and the applicable case law."  *Id.*

Here, Defendant's conduct is not the kind of conduct tolerated in a civilized society.  While overall short in duration, Defendant's conduct resulted in serious emotional injury to Plaintiff from which he continues to suffer almost two years after the incident.  Accordingly, given Defendant's offensive behavior (i.e., unwelcomed touching, taking photographs, and sending inappropriate text messages), Plaintiff's resulting emotional distress that resulted in months of therapy, the short duration of the incident, along with similar cases, the Court **RECOMMENDS** that Plaintiff be awarded $175,000.00 in compensatory damages.

### B. Punitive Damages

At the hearing, Plaintiff requested $2 million in punitive damages. The Court inquired as to whether Plaintiff had any case law wherein a plaintiff was awarded a comparable amount based on a similar fact pattern. Plaintiff stated that he did have any cases to present at that time and stated that he was not certain if the Court would bifurcate punitive damages. Plaintiff stated, however, that he would submit a supplemental brief addressing similar cases. The Court granted Plaintiff two weeks to file his supplemental brief. In his Post-Hearing Brief, he requests an additional hearing to determine the appropriate amount of punitive damages to be awarded.

The Court declines to reopen the evidentiary hearing. During the April 6 show cause hearing, the Court directed the parties to be prepared to proceed on damages at the April 29 hearing. Plaintiff requested $2 million in punitive damages at the April 29 hearing. In his Post-Hearing Brief [Doc. 40], Plaintiff asserts that if the factfinder determines punitive damages are appropriate, "an additional hearing must be held in order to determine the appropriate amount of punitive damages to be awarded." [Doc. 40 at 4]. Plaintiff, however, has not cited any federal rule that mandates bifurcation of an evidentiary hearing on a default judgment.[4] Further, Plaintiff has not explained pursuant to Federal Rule of Civil Procedure 42 why bifurcation is necessary in this case. Finally, the Court finds that it has sufficient evidence to recommend an appropriate award for punitive damages. Accordingly, the Court declines to reopen the evidentiary hearing.

---

[4] In Tennessee, if punitive damages are sought, the trial court shall bifurcate the trial upon a motion filed by defendant. *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 901 (Tenn. 1992). While the instant case is based on state tort law, federal procedure still applies. *Bonasera v. New River Elec. Corp.,* No. 2:19-CV-3817, 2021 WL 490257, at *8 (S.D. Ohio Feb. 10, 2021) (explaining that while state law mandated bifurcation of punitive damages, Federal Rule of Civil Procedure 42(b) controlled).

16

Case 3:19-cv-00495-CEA-DCP Document 41 Filed 07/30/21 Page 16 of 20
PageID #: 238

Based on the evidence at the April 29 hearing, however, the Court does find that Plaintiff is entitled to an award of punitive damages. Tennessee law authorizes an award of punitive damages in "cases involving fraud, malice, gross negligence, oppression, evil motives, conscious indifference, and reckless conduct implying 'disregard of social obligations.'" *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 900-01 (Tenn. 1992). In order to award punitive damages, a court must find that defendant acted (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly. *Id.* at 901.

The Court finds Defendant's actions against Plaintiff were intentional and that he asserted his supervisory authority to force Plaintiff to engage in inappropriate conduct. Defendant took photographs of Plaintiff's genitals, and Plaintiff does not know what happened to those photographs. Defendant offered no explanation at the evidentiary hearing as to what he did with the photographs. After the incident in Defendant's office, Defendant sent Plaintiff inappropriate text messages about Plaintiff's genitals and requested more photographs. Accordingly, the Court finds Defendant's conduct warrants an award of punitive damages.

In considering the amount of punitive damages that should be awarded, courts are instructed to consider the following factors:

> (1) The defendant's financial affairs, financial condition, and net worth; (2) The nature and reprehensibility of defendant's wrongdoing, for example (A) The impact of defendant's conduct on the plaintiff, or (B) The relationship of defendant to plaintiff; (3) The defendant's awareness of the amount of harm being caused and defendant's motivation in causing the harm; (4) The duration of defendant's misconduct and whether defendant attempted to conceal the conduct; (5) The expense plaintiff has borne in the attempt to recover the losses; (6) Whether defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior; (7) Whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act; (8) Whether, once the misconduct became known to defendant,

> defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and (9) Any other circumstances shown by the evidence that bear on determining the proper amount of the punitive award.

*Hodges,* 833 S.W.2d at 901–02. "In addition to state law considerations that bear on the question of punitive damages, the United States Supreme Court has noted that an award of punitive damages is subject to constitutional limitations." *Pruett v. Skouteris*, 743 F. Supp. 2d 718, 728 (W.D. Tenn. 2010). Thus, a "'grossly excessive punishment' may not be imposed on a tort feasor.'" *Id.* (quoting *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 562 (1996)). With the above guidelines, the Court turns to the facts in this case.

In the instant matter, Defendant's conduct is reprehensible. As explained above, Defendant touched Plaintiff in the utmost offensive manner, took photographs of Plaintiff's genitals, and also sent Plaintiff extremely inappropriate text messages. The Court has already described the impact Defendant's conduct had on Plaintiff. In addition, during this time, Plaintiff was Defendant's direct subordinate. The evidence indicates that Defendant abused his supervisory authority at Plaintiff's expense. Further, although Plaintiff did not testify about his specific moving expenses, Plaintiff testified that as a result of Defendant's actions, he moved to Utah to seek treatment and to avoid any encounters with Defendant. The Court also notes that Defendant did not respond to this lawsuit until the Court issued its Show Cause Order about a year after Defendant had been served, which shows that Defendant did not take remedial action. Moreover, Defendant's statements to Plaintiff regarding Plaintiff's advancement in the company and whether Plaintiff enjoyed his job, immediately before the conversation became inappropriate, leads the Court to believe that Defendant was aware that his actions would harm Plaintiff.

Finally, the Court notes that there is no evidence that Defendant profited from his conduct or that Defendant has been subjected to previous punitive awards. With respect to Defendant's

18

net worth, although Plaintiff did not present proof as to Defendant's finances, the Court notes that at the April 6 hearing, Defendant explained that he had been furloughed in 2020 and was worried about keeping his apartment and vehicle. Based on these statements, the Court does not find that Defendant's net worth affects the amount of recommended punitive damages.

Furthermore, the Court has also taken into the consideration that although Defendant's conduct was outrageous, it does appear to the Court that it occurred over a long period of time. Accordingly, given the above, the Court **RECOMMENDS** that Plaintiff be awarded $175,000.00 in punitive damages. *See McPeters*, 2021 WL 1030981, at *1 (awarding plaintiff $250,000.00 in punitive damages).

As a final matter, the Court finds Plaintiff's requested amount of $2 million to be excessive. The Court has considered the *Hodges* factors and finds $175,000.00 to be a more appropriate figure for Defendant's conduct in this case. The Court finds this amount will serve the "twin purposes" of a punitive damages award, which are "punishment and deterrence." *Hodges,* 833 S.W.2d at 901.

## V. CONCLUSION

Based upon these findings and taking all well-pleaded actions in the Amended Complaint as true as they relate to Defendant, the undersigned **RECOMMENDS**[5] as follows:

---

[5] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Civ. P. 72(b)(2). Such objections must conform to the requirements of Federal Rule of Civil Procedure 72(b). Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 153-54 (1985). "[T]he district court need not provide *de novo* review where objections [to the Report and Recommendation] are '[f]rivolous, conclusive or general.'" *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 410 n.8 (5th Cir.1982)). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

1. Plaintiff's Motion for Default Judgment [**Doc. 31**] be **GRANTED IN PART AND DENIED IN PART**;

2. That Defendant be **ADJUDGED** for assault and battery and intentional infliction of emotional distress; and

3. That Plaintiff be awarded $350,000.00, constituting $175,000.00 in compensatory damages and $175,000.00 in punitive damages.

Respectfully submitted,

*Debra C. Poplin*
Debra C. Poplin
United States Magistrate Judge